IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HABAS SINAI VE TIBBI GAZLAR ISTIHSAL A.S., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | )   Civil Action No. 19-608 |
| | ) |
| INTERNATIONAL TECHNOLOGY & KNOWLEDGE COMPANY, INC., INTEKNO TEKNOLOJI TRANSFER SANAYI VE TICARET A.S., and HALIL KULLUK, | ) |
| | ) |
| Defendants. | ) |

## **<u>MEMORANDUM OPINION</u>**

Plaintiff Habas Sinai Ve Tibbi Gazlar Istihsal A.S. (Plaintiff or "Habas"), a Turkish corporation, brings this action against Defendants International Technology & Knowledge Co., a Pennsylvania corporation ("Intekno (US)"), Intekno Teknoloji Transfer Sanayi Ve Ticaret A.S., a Turkish corporation ("Teknoloji Transfer"),[1] and Halil Kulluk ("Kulluk"), the sole officer and shareholder of Intekno (US) and a controlling shareholder of Teknoloji Transfer.

The Complaint alleges that Defendants offered to sell graphite electrodes to Habas and while Habas accepted this offer, Defendants did not deliver these goods.[2] Habas states that it was forced to obtain the goods from an alternate supplier at a higher cost which it seeks to recover from Defendants.

Pending before the Court is the motion to dismiss of Teknoloji Transfer and Kulluk based upon lack of personal jurisdiction and failure to state a claim upon which relief can be granted.

---

[1] Habas refers to the Turkish entity as "Intekno (Turkey)" and the US entity as "Intekno (US)." In this opinion, the Turkish entity will be referred to as "Teknoloji Transfer," the US entity will be referred to as "Intekno (US)," and the term "Intekno" will be employed when referring to both entities. As explained herein, both are members of "the Intekno Group."
[2] ECF No. 13.

For the reasons that follow, the motion will be granted on the basis of lack of personal jurisdiction.

## I. Relevant Procedural History

Plaintiff commenced this action on May 23, 2019 against Intekno (US) and Teknoloji Transfer and later filed an Amended Complaint which added Kulluk as a defendant. Diversity of citizenship jurisdiction is asserted, 28 U.S.C. § 1332, because the action is between Habas, a citizen of Turkey, and Intekno (US), a Pennsylvania citizen. (Am. Compl. ¶ 4.)

On November 24, 2020, Teknoloji Transfer and Kulluk ("the Moving Defendants") filed a motion to dismiss (ECF No. 25) which has been fully briefed (ECF Nos. 26, 37, 40). Oral argument was held on February 18, 2021.[3]

## II. Factual Background

Habas produces industrial and medical gases, steel, electrical energy and heavy machinery. Intekno is a seller of materials utilized in the manufacture of steel, including graphite electrodes, which are key components used primarily in electric and arc furnace steel manufacturing. At all times relevant hereto, the global supply of graphite electrodes was limited such that steel manufacturers' production programs depended heavily on the availability and timely delivery of the electrodes. For example, because of the limited global supply of graphite electrodes during time period relevant to the claims asserted herein, steel manufacturers such as

---

[3] As Habas has noted (ECF No. 37 at 10 n.2), Intekno (US) did not file an answer. At the oral argument, counsel for all Defendants indicated that he would do so once the pending motion has been resolved. The Court observes that a motion to dismiss filed by some defendants does not automatically relieve other defendants of their duty to answer the complaint or otherwise defend the action. *See Hanley v. Volpe*, 48 F.R.D. 387, 388 (E.D. Wis. 1970). However, several courts have concluded that representation by the same attorney and the likelihood of all parties filing a joint answer and participating jointly in discovery was sufficient to satisfy the "otherwise defend" requirement. *See Alston v. Sharpe*, 2015 WL 4715340, at *1 (D. Conn. Aug. 7, 2015); *Buckles v. Focus on Innovation, Inc.*, 2013 WL 5305683, at *2 (M.D. Fla. Sept. 20, 2013). On March 21, 2021, Intekno (US) filed an answer.

Habas were typically required to purchase electrodes up to one year in advance of delivery in order to maintain their production models. (Am. Compl. ¶¶ 6-9.)

Habas alleges that, beginning in February 2017, it engaged in negotiations with "Intekno" (in its use of this term, Habas refers to both companies) concerning the sale of graphite electrodes. In April 2017, Intekno offered to sell Habas approximately 900 metric tons of graphite electrodes for a total price of $3,352,500, to be delivered to Habas in Turkey in a series of three (3) separate 300 metric ton shipments in March, April and May 2018. Habas accepted this offer. On or about April 26, 2017, Intekno issued ProForma Invoice No. PF042017107 to Habas consistent with the agreed-upon sale terms (the "ProForma Invoice.") (*Id.* ¶¶ 10-11 & Ex. 1.)[4]

In its brief in opposition to the motion to dismiss, Habas states the facts somewhat differently. Relying on the declaration of Berhan Elmaslar, who works for the Import Department of Habas in Turkey (Elmaslar Decl. ¶ 1),[5] Habas now asserts that the contract at issue was negotiated over several months in a series of emails between Habas and Teknoloji Transfer in Turkey; that an agreement was reached in an April 24, 2017 email in which Habas accepted the terms of Teknoloji Transfer's April 19, 2017 order; that on April 25, 2017, Teknoloji Transfer thanked Habas its order and requested certain information about the company to which the invoice will be issued, to which Habas responded on the same date; and that on April 26, 2017, Teknoloji Transfer submitted the ProForma Invoice which was "based on our previous conversations and confirmations" and requested that it be executed and returned to

---

[4] No Intekno entity was involved in the manufacture of the graphite electrodes; Intekno acts as a broker or trader and the ProForma Invoice states that the manufacturer was "Graftech Iberica S.L., Pamplona Spain." (Am. Compl. Ex. 1.) See also Elmaslar Decl. Ex. A (emails describing Graftech as the manufacturer).

[5] ECF No. 37 Ex. 1.

Teknoloji Transfer, although the invoice itself was issued and executed by Intekno (US). Mr. Elmaslar states that the ProForma Invoice memorialized the terms of the agreement that had been negotiated between Habas and Teknoloji Transfer and that Habas executed and returned the ProForma Invoice to Teknoloji Transfer as requested. (*Id.* ¶¶ 4-10 & Exs. A, B.)

Habas's brief asserts that Teknoloji Transfer and Habas "had an enforceable agreement *prior* to any involvement by Intekno (US)." It claims that "Intekno (US) played no role in this matter until *after* Habas and [Teknoloji Transfer] reached and confirmed their agreement to the Contract in writing." (ECF No. 37 at 14.)

The ProForma Invoice issued to Habas provided a Pittsburgh address for Intekno (US) as well as Pittsburgh-area telephone and facsimile numbers. It also identifies Teknoloji Transfer as the representative agent for Intekno (US) with respect to the transaction.[6]

Habas planned its steel production program based on the electrode shipment timeline set forth in the Proforma Invoice. Notwithstanding Intekno's knowledge of Habas's need for the timely delivery of the electrode shipments, Intekno failed to deliver any shipments of the electrodes during the March through May 2018 timeframe specified in the ProForma Invoice. (Am. Compl. ¶¶ 12-14 & Ex. 1.)

Elmaslar states that on January 19, 2018, Habas sent an email reminder to Teknoloji Transfer to fulfill the contract. Further, in March 2018, Teknoloji Transfer contacted Habas by telephone and email to request an in-person meeting to "discuss face-to-face the developments since last year," noting that "Intekno Chairman Halil Kulluk" would attend the meeting. (Elmaslar Decl. ¶¶ 11-12 & Exs. C, D.)

---

[6] In its brief, Habas also notes that the ProForma Invoice indicates that its payments should be sent to Intekno (US)'s account at PNC Bank in Pittsburgh (Am. Compl. Ex. 1). During oral argument, Defendants' counsel indicated that no money was sent to this bank account.

In correspondence dated November 7, 2018 (the "Letter of Notice"), Habas: (a) advised Intekno (US) that Habas suffered damages as a result of Intekno's failure to deliver the goods per the contract at any time; (b) provided Intekno (US) an additional fifteen (15) days to perform under the contract; (c) informed Intekno (US) that it would consider non-delivery after that prescribed time period to constitute a notice of avoidance of the contract; and (d) notified Intekno (US) that it would claim damages that included the recovery of the difference between the contract price and the price for the purchase of substitute cover goods on the market. (Am. Compl. ¶ 15 & Ex. 2; Elmaslar Decl. ¶ 14 & Ex. E.)[7]

Intekno (US) then advised Habas by correspondence on November 23, 2018, that the electrodes would not be delivered at all. (Am. Compl. ¶ 16 & Ex. 3; Elmaslar Decl. ¶ 15 & Ex. F.)[8] Because it did not receive the electrodes per the terms of the contract and in mitigating its damages as a direct consequence of the breach, Habas was forced to purchase substitute goods on the market from a German entity for $12,980,000. (Am. Compl. ¶ 17 & Ex. 4; Elmaslar Decl. ¶ 16 & Ex. G.)

Elmaslar concludes his Declaration with the following statement:

> After investigating Defendants' failures and given that the Proforma Invoice memorializing the terms of the agreement between Habas and Intekno (Turkey) was issued and executed by Intekno (US), based in Allegheny County, Pennsylvania, Habas filed suit in the United States District Court for the Western District of Pennsylvania, alleging claims for breach of contract.

---

[7] The Amended Complaint alleges that the Letter of Notice was sent to "Intekno" without identifying the entity, but the Elmaslar Declaration and the actual notice attached thereto indicate that the notice was sent to Intekno (US).

[8] Again, while the Amended Complaint alleges that the November 23 reply came from "Intekno," Elmaslar's Declaration and the reply itself show that it sent on behalf of Intekno (US). The reply indicated that, because of "publicly known developments in the iron & steel industry which affected the global and local market conditions, Graftech officially informed that they would not be supplying the said graphite electrodes as promised by themselves due to several reasons."

(Elmaslar Decl. ¶ 17.)

### III.    Facts Relevant to Personal Jurisdiction

#### A.  Facts Regarding Kulluk

Kulluk states that he is a resident and citizen of Turkey, having been born there in 1960. (Kulluk Decl. ¶¶ 2-3.)[9] He arrived in Pittsburgh in 1983 to start graduate school at Carnegie Mellon University (CMU), from which he graduated with a degree in Mechanical Engineering. (*Id.* ¶¶ 4-5.) He then became a Research Engineer at CMU's Robotics Institute and over the next several years he rose to various other positions at the Institute. (*Id.* ¶¶ 6-10.)

In December 1991, he returned to Istanbul with his family. Neither her nor any members of his family live in Pittsburgh and he has not lived here since he returned to Turkey in 1991. He visited Pittsburgh at least twice each year between 1992 and 2015 for business purposes and to see friends, spending a maximum of 2-3 weeks in the United States each visit, except during the summer of 2000 when he spent two months in Pittsburgh with his family. Since 2011, he has spent more time in Boston after his son enrolled at Babson College. In 2016, he spent four months in Boston when his daughter started a graduate program at Harvard University. During his stays in Boston, he has occasionally visited Pittsburgh. He has not traveled to the United States at all since January 2020 because of the pandemic. (*Id.* ¶¶ 11-17.)

Habas notes that, according to Kulluk's LinkedIn Profile, he serves as the president of CMU's alumni association in Turkey and is the lead volunteer on CMU's Turkey Network page, which provides his Intekno email address as his contact information. (Jacobs Decl. ¶¶ 12-13 & Ex. F.)[10] Kulluk responds that, although he is proud of his connection with CMU, he functions as

---

[9] ECF No. 40 Ex. 6.
[10] ECF No. 37 Ex. 2. Habas's brief states that Kulluk has "close ties to Pittsburgh." (ECF No. 37 at 6, 16.) However, it cites Paragraph 11 of the Jacobs Declaration, in which Mr. Jacobs

an ambassador and booster of the University in Turkey. He does not live or work in the United States. (Kulluk Decl. ¶ 18.)

B.  Facts Regarding to Intekno (US) and Teknoloji Transfer

Kulluk started Intekno (US) as a sole proprietorship in 1987 and converted it to an S-corporation in 1989. (Kulluk Decl. ¶ 19 & Ex. A.) In the early days, the company worked on projects that he had started at CMU. (*Id.* ¶ 20.) However, after Kulluk returned to Turkey in 1991, the company's business model changed to became a platform for occasional consulting activities and business requirements. (*Id.* ¶¶ 11, 21.)

Kulluk notes that because Turkish import and tax regulations created cash flow and tax advantages for international transactions that were not available for purely domestic transactions, almost all Turkish steelmaking companies generally prefer to buy the consumable products from companies/traders located outside Turkey to take advantage of these incentives under Turkish law. Consequently, Intekno (US) evolved to focus on international sales of consumable products (for example, graphite electrodes) for the iron and steel industry in Turkey. (*Id.* ¶¶ 22-23.)

Teknoloji Transfer, an affiliated company in the Intekno Group, acts as Intekno (US)'s representative agent in connection with these sales, pursuant to an agreement between these two companies. (*Id.* ¶ 24 & Ex. B.) According to Kulluk, Teknoloji Transfer is a domestic Turkish corporation that has no presence and does no business in the United States. (*Id.* ¶ 25.)

Kulluk assets that Habas is well aware of the available tax advantages of purchasing from a foreign supplier, both because such transactions are common practice in the iron and steel industry in Turkey and because Habas made a previous international purchase of graphite

---

describes how he was notified by an individual from the University of Pittsburgh's Institute for Entrepreneurial Excellence that Kulluk wanted to speak to him. Thus, Habas offers no support for this statement. Moreover, having "close ties" to a jurisdiction is not a proper measure for personal jurisdiction purposes.

electrodes from another off-shore company in the Intekno Group in the 2010-2011 period. He further asserts that the ProForma Invoice issued by Intekno (US) and the exchange of emails between Habas and Teknoloji Transfer reflect the international nature of the proposed transaction: the communications indicate that the electrodes would be delivered "CIF" (meaning the seller would be paying Cost, Insurance and Freight) and that payment would be "CAD" (or Cash Against Documents). Had the proposed transaction been a domestic one between Teknoloji Transfer and Habas (two Turkish companies), the payment would have indicated whether or not the Turkish Value Added Tax was included in the price, and would not have provided for CAD payment, but direct domestic payment. (*Id.* ¶¶ 27-30.)

The Pennsylvania Bureau of Corporations identifies Intekno (US) as a Pennsylvania corporation with an address of 2908 McKelvey Road, Pittsburgh, Pennsylvania 15221 and identifies Kulluk as the President and Treasurer of Intekno (US) with an address of 4885A McKnight Road, Pittsburgh, Pennsylvania 15237. Habas retained a process server in this matter to serve Intekno (US), but the process server advised Habas that neither of the Pennsylvania addresses listed above was affiliated with Intekno (US). During a subsequent phone call, Kulluk advised Habas's counsel that Intekno (US) is a Pennsylvania S-corporation that pays Pennsylvania taxes and that he the Chairman and Chief Executive Officer of the Intekno Group and the sole officer and employee of Intekno (US) and all busines operations are conducted through him, but Intekno (US) does not have a physical location within the United States or a registered agent for the purposes of authorized acceptance of service. (Am. Compl. ¶¶ 18-26; Jacobs Decl. ¶¶ 4-10 & Exs. A, B, C, E.)[11] Habas also states that Intekno (US) and Teknoloji

---

[11] The Amended Complaint alleges that the McKnight Road location "is a UPS Store in the Wexford area of Pittsburgh that has no connection with Intekno (US)." (Am. Compl. ¶ 22.) However, as Defendants note, this allegation is contradicted by the exhibits to the Amended

Transfer "use a single, shared website for both businesses with only a single contact listed on said website, and the companies appear to use identical trademarks, logos and marketing images." (Jacobs Decl. ¶ 15 & Ex. I.)

Kulluk asserts that Intekno (US) has maintained its good standing as a Pennsylvania corporation for over 30 years and that, because of the nature of its business as a trader specializing in supplying the iron and steel industry in Turkey, it does not require a significant physical presence in the United States to carry on its business. Rather, it maintains a post office box and forwarding service at the Pennsylvania address shown on the Pennsylvania Bureau of Corporations website and listed on the ProForma Invoice attached to Habas's Amended Complaint. (Kulluk Decl. ¶¶ 31-33 & Ex. C.) Communications to that box are forwarded to Turkey, as was the case with the Letter of Notice attached to Habas's Amended Complaint. (*Id.* ¶ 34.) With respect to the website, the Moving Defendants respond that Habas has only attached the contact page and that the actual website explains that the companies were "established, one after another, as the group diversified its activities focusing on unique fields with strong growth potential in and around Turkey." (ECF No. 40 Ex. 1.)

Kulluk states that Intekno (US) has been generally profitable and pays income taxes to Pennsylvania and the United States each year, that it has sufficient capital to carry on its business as an international trader, which it has done for decades, and that he does not intermingle any Intekno (US) funds with his personal funds. (Kulluk Decl. ¶¶ 35-37.)

Kulluk indicates that, although he is the sole shareholder of Intekno (US) and a

---

Complaint, which show that Habas successfully communicated with Intekno (US) about the transaction at issue through the post office box at this location. (*Id.* Exs. 2, 3.) Therefore, it is entitled to no weight because "[w]here there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) (citation omitted).

controlling shareholder of Teknoloji Transfer, they are operated as separate corporations, with Teknoloji Transfer doing no business and having no presence in the United States. (*Id.* ¶ 38.)

Finally, Habas contends that the Court has personal jurisdiction over Teknoloji Transfer, and Kulluk because they, along with Intekno (US), were parties to "previous litigation," specifically a bankruptcy action in this district and an action in the Court of Common Pleas of Allegheny County, in which judgments were entered against Defendants in the amount of $838.372.52. (Jacobs Decl. ¶ 14.)

The Moving Defendants respond that in the bankruptcy case, Teknoloji Transfer contested personal jurisdiction as it has done here (including the argument that it is the alter ego of Intekno (US)). The bankruptcy court never resolved these issues on the merits, but instead dismissed defendants' motions to dismiss in a single sentence order. Further, the judgment was a default judgment, not a judgment on the merits, and the case was ultimately settled pursuant to a stipulated settlement agreement without any admission of liability. (ECF No. 40 Exs. 3-5.) Thus, they argue, this case provides no support for personal jurisdiction over Teknoloji Transfer or Kulluk in Pennsylvania.[12]

## IV.  Discussion

### A.  Personal Jurisdiction

Rule 12(b)(2) requires dismissal of a complaint if the plaintiff fails to establish that the court has personal jurisdiction over the parties. Fed. R. Civ. P. 12(b)(2). "Once it is challenged,

---

[12] During oral argument, Habas's counsel was asked if he was attempting to establish personal jurisdiction over Teknoloji Transfer and Kulluk based upon the prior litigation and he responded that he was not, but rather, highlighted the prior litigation to counter the Moving Defendants' argument that haling them into this jurisdiction would "offend traditional notions of fair play and substantial justice." As explained below, however, that issue only arises if a plaintiff has demonstrated that a defendant has "purposefully directed its activities at the forum" and that the plaintiff's claims "arise out of or relate to" those specific activities.

the burden rests upon the plaintiff to establish personal jurisdiction. A nexus between the defendant, the forum and the litigation is the essential foundation of in personam jurisdiction." *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (citation omitted).

The court initially must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff," who only needs to establish a "prima facie case," although the court can reconsider the issue "if it appears that the facts alleged to support jurisdiction are in dispute," and can conduct an evidentiary hearing to resolve any disputed facts. *Carteret Savs. Bank, FA v. Shushan*, 954 F.2d 141, 142 & n.1 (3d Cir. 1992). "Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence" and may not "rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984).[13]

Specific personal jurisdiction arises from a defendant's forum-related activities and may be established even where the defendant has not physically appeared in the state but has "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (citations omitted).

"In determining jurisdiction over a breach of contract claim, we must consider the totality

---

[13] At the oral argument, counsel for the Moving Defendants explained that he did not initially submit declarations in support of the motion to dismiss because the Amended Complaint on its face failed to substantiate a basis for exercising personal jurisdiction over Teknoloji Transfer and Kulluk. However, when Habas responded by arguing that the contract consisted of emails rather than the invoice and attached declarations in support of this new theory, the Moving Defendants filed a reply brief that attached Kulluk's declaration and other materials. The Court will consider all of this evidence.

of the circumstances, including the location and character of the contract negotiations, the terms

of the contract, and the parties' actual course of dealing." *Remick v. Manfredy*, 238 F.3d 248, 256

(3d Cir. 2001) (citation omitted). *See also General Elec.*, 270 F.3d at 150 ("In contract cases,

courts should inquire whether the defendant's contacts with the forum were instrumental in

either the formation of the contract or its breach.").

> As summarized by the Court of Appeals:
>
> The inquiry as to whether specific jurisdiction exists has three parts. First, the defendant must have "purposefully directed [its] activities" at the forum. Second, the litigation must "arise out of or relate to" at least one of those activities. *Helicopteros [Nacionales de Columbia, S.A. v. Hall]*, 466 U.S. [408,] 414, 104 S.Ct. 1868 [(1984)]; *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1559 (3d Cir. 1994). And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"

*O'Connor v. Shady Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007) (quoting *Burger*

*King*, 471 U.S. at 472, 476) (footnote omitted).

With respect to general personal jurisdiction over a corporation, the Supreme Court has

held that the proper inquiry "is whether that corporation's 'affiliations with the State are so

"continuous and systematic" as to render [it] essentially at home in the forum State.'" *Daimler*

*AG v. Bauman*, 571 U.S. 117, 138 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v.*

*Brown*, 564 U.S. 915, 919 (2011)). Other than in an "exceptional case," the only forums that will

be appropriate are a corporation's state of incorporation and its principal place of business. *Id.* at

139 n.19.

The Federal Rules of Civil Procedure authorize a district court to assert personal

jurisdiction over a non-resident to the extent permissible under the law of the state where the

district court sits. Fed. R. Civ. P. 4(k)(1)(A). *O'Connor*, 496 F.3d at 316. Pursuant to

Pennsylvania's long arm statute, 42 Pa. C.S. § 5322(a), a plaintiff can establish specific personal

jurisdiction by showing that a defendant has engaged in forum related activities.

Pennsylvania also authorizes exercise of the jurisdiction of its courts over non-residents "where the contact is sufficient under the Constitution of the United States," 42 Pa. C.S. § 5308, and "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. C.S. § 5322(b). *See Kubik v. Letteri*, 614 A.2d 1110, 1114 (Pa. 1992) (following *Burger King* analysis).

1. <u>Personal Jurisdiction Over Kulluk</u>

Habas contends that the Court can exercise general personal jurisdiction over Kulluk based on the fact that he has traveled to Pennsylvania frequently over the years for "business purposes," because there is a "presumption" that his domicile is still Pennsylvania and because all Intekno (US) business is conducted through him. *See McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006) (a "domicile once acquired is presumed to continue until it is shown to have been changed.")

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile…." *Goodyear Dunlop Tires*, 564 U.S. at 924. Pennsylvania authorizes its courts to exercise general jurisdiction over individuals pursuant to 42 Pa. C.S. § 5301(a)(1) by showing "[p]resence in this Commonwealth at the time when process is served," "[d]omicile in this Commonwealth at the time when process is served," or "[c]onsent, to the extent authorized by the consent." *See Decker v. Dyson*, 165 Fed. Appx. 951, 953 (3d Cir. 2006) ("Under Pennsylvania law, general jurisdiction arises over an individual, non-corporate defendant if the person's domicile or presence was in the state at the time of service of process, or there was consent to suit.").

Kulluk states that he is not domiciled in Pennsylvania and he has not consented to the exercise of personal jurisdiction over him. Habas has not argued that he was present in Pennsylvania at the time process was served. Therefore, there is no basis to assert general personal jurisdiction over him.[14]

To the extent that Habas is suggesting that Kulluk had "continuous and systematic" contacts with Pennsylvania based on his trips to the United States and Pennsylvania over the years, this discussion would not be on point because that standard applies to corporations and other similar entities, not individuals. In *Farber v. Tennant Truck Lines, Inc.*, 2015 WL 518254, at *11-12 (E.D. Pa. Feb. 9, 2015), plaintiff attempted to assert personal jurisdiction over an individual who made many business trips to Pennsylvania on the basis that he had "continuous and systematic" contacts with the state. In rejecting this argument, the court held that:

> this argument misstates the law: the Pennsylvania personal jurisdiction statute provides that the "carrying on of a continuous and systematic part of its general business" basis of jurisdiction applies to corporations, partnerships, limited partnerships, partnership associations, professional associations, unincorporated associations, or similar entities—not individuals. 42 Pa. Cons. Stat. § 5301(a)(1)-(3). Furthermore, the facts that the Plaintiffs put forth regarding [the individual's] business travel have no bearing in the face of decisions like *Mass. School of Law*, *Comerota*, or *Decker*, which unequivocally permit the exercise of general jurisdiction in Pennsylvania only over a nonresident individual who (1) lives here, (2) was served here, or (3) consented to suit here. The Plaintiffs have cited no authority to the contrary, merely concluding without support that "[j]urisdiction is proper in Pennsylvania." Jurisdiction is **not** proper in Pennsylvania.

*Id.* at *12.

Kulluk has not consented to the exercise of personal jurisdiction, he is not domiciled in Pennsylvania and there is no evidence that he was served in Pennsylvania. Therefore, general

---

[14] As explained in the text, Kulluk has lived in Turkey since 1991. Thus, Habas cannot contend that his "domicile" remained in Pennsylvania 26 years after he left the Commonwealth.

personal jurisdiction cannot be exercised over him.[15]

Habas also argues that specific personal jurisdiction can be asserted over Kulluk based on a theory of piercing the corporate veil. Kulluk denies that Habas has presented any viable basis for applying this theory.

The Pennsylvania Supreme Court has held that "there is a strong presumption in Pennsylvania against piercing the corporate veil. *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995). As the Court of Appeals has observed:

> We have identified several factors helpful in determining whether, as a matter of federal common law, a subsidiary is merely an alter ego of its parent. Those factors include "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of [subsidiary] corporation, siphoning of funds from the [subsidiary] corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a façade for the operations of the dominant stockholder." *Pearson [v. Component Tech Corp.]*, 247 F.3d [471,] 484-85 [(3d Cir. 2001)]. No single factor is dispositive, and we consider whether veil piercing is appropriate in light of the totality of the circumstances. *Cf. Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (explaining that the alter ego test factors do not comprise "a rigid test"); *Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.*, 736 F.2d 879, 887 (3d Cir. 1984) (requiring "specific, unusual circumstances" before piercing the corporate veil (citation omitted)).
>
> Proving that a corporation is merely an alter ego is a burden that "is notoriously difficult for plaintiffs to meet." *Pearson*, 247 F.3d at 485. "[I]n order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." *Id.* Under our precedent, the basis for piercing the corporate veil must be "shown by clear and convincing evidence." *Lutyk*, 332 F.3d at 192 (quoting *Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994)).

*Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365-66 (3d Cir. 2018) (footnotes omitted). *See also Kaplan*, 19 F.3d at 1521 (piercing the corporate veil is "available only if it is

---

[15] At any rate, even if the "continuous and substantial" analysis was applied to Kulluk, his twice-annual 2 to 3 week visits to Pennsylvania between 1992 and 2015 would not meet this standard.

also shown that a corporation's affair and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors.")

"Also the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. 2004) (citation omitted). The "lack of formalities in a closely-held or family corporation has often not been found to have as much consequence as where such a closely-held corporation is not involved." *Zubik v. Zubik*, 384 F.2d 267, 271 n.4 (3d Cir. 1967) (citation omitted).

Under the related "alter ego" theory, a court may find that when the corporation or person in control of another organization "uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded." To succeed on the alter ego theory, the party seeking to establish liability must show that the individual who controlled the corporation "wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." In other words, the complainant must show "that the controlled corporation acted robot-or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Partners Coffee Co., LLC v. Oceana Servs. & Prod. Co.*, 700 F. Supp. 2d 720, 737 (W.D. Pa. 2010) (citations omitted).

Notably, both Habas and Defendants were asked during oral argument if further discovery was necessary in order to resolve this issue, and both indicated that no further discovery was necessary.

In support of its veil-piercing theory, Habas alleges that:

At the time of the formation of the Contract, Kulluk managed, dominated and controlled Intekno (US) and exercised authority over its business operations such that Intekno (US) was an instrument and agent of Kulluk.

At the time of the formation of the Contract, Kulluk and Intekno (US) were "alter egos," such that the corporate form should be disregarded and Kulluk held to be bound by the Contract as it relates to Intekno (US).

Intekno (US) was the instrumentality or alter ego of Kulluk because Kulluk failed, upon information and belief, to observe corporate formalities, including but not limited to, failing to: (a) adequately capitalize Intekno (US); (b) adopt and abide by company bylaws; (c) issue stock; (d) pay dividends; (e) hold annual shareholder meetings with recorded minutes; (f) keep sufficient separate books, records and accounts; (h) [sic] maintain a separate, independent and physical location for Intekno (US); and (i) appoint, retain or use other functioning officers, directors or employees.

The alter ego also results, upon information and belief, from Kulluk's commingling of Intekno (US) funds and/or assets with his own personal funds and assets, and/or Kulluk's diverting of corporate funds and/or assets for his own personal use.

Adherence to the protections of the corporate form here would perpetuate injustice because the material terms of the Contract as between Habas and Intekno (US) would be rendered meaningless, and it would result in a failure of Habas to receive the benefit of the bargain.

Because Kulluk and Intekno (US) were alter egos, the corporate veil theory may—and should be—pierced so that Kulluk is subject to this count by Habas as it relates to the breach of the Contract by Intekno (US).

(Am. Compl. ¶¶ 35-40.)

The Moving Defendants argue that these allegations are vague and unsupported (and at times even contradicted by the evidence of record) and do not justify a claim of piercing the corporate veil. First, the "instrument and agent" allegation is a legal conclusion, not a fact. Second, the allegation that Kulluk commingled corporate funds and assets with his own personal funds and diverted corporate funds for his own personal use is unsupported and directly contradicted by Kulluk's declaration to the contrary. Defendants argue that Habas does not allege

well-pleaded facts but pure rote recitations without any factual basis, which are not entitled to any weight. *See Germain v. Wisniewski*, 2016 WL 4158994, at *3 (W.D. Pa. Aug. 5, 2016) ("While Plaintiff has made general, conclusory statements regarding the need to pierce the corporate veil to avoid injustice, the Complaint does not contain factual allegations that speak to any of the factors that Pennsylvania courts consider when deciding whether to pierce the corporate veil.")

Habas argues that "Courts have held veil-piercing to be appropriate 'when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime.'" *Pearson,* 247 F.3d at 484 (quoting *Zubik*, 384 F.2d at 272). However, it has not even suggested that Defendants engaged in fraud, illegality, injustice or shielding someone from liability for a crime. Habas also cites *Morelia Consultants, LLC v. RCMP Enterprises, LLC*, 2011 WL 4021070 (M.D. Pa. Sept. 9, 2011), to support the argument that a plaintiff may allege alter ego liability based upon a corporation being undercapitalized. However, in that case, the plaintiff did not just make the bare allegation that the defendant was undercapitalized. Rather, it alleged that its managing member "would personally pay certain obligations of RCMP, or cause RCMP to be funded only to the limited extent that it was able to pay certain limited obligations as they [became] due." *Id.* at *8. *See also Ginley v. E.B. Mahoney Builders, Inc.*, 2004 WL 2137820, at *1 n.6 (E.D. Pa. Sept. 23, 2004) (cited by Habas but omitting court's statement that "Plaintiff must set forth the conduct which Defendant Mahoney allegedly engaged in that would bring his actions within the parameters of a cause of action based on a theory of piercing the corporate veil," which it met by alleging that he engaged in conversion of funds and failures of accounting.)

In light of the strong presumption against piercing the corporate veil, *Trinity Indus.*, 903

18

F.3d at 365, and the requirement that proof that a corporation is a mere alter ego "must be shown by clear and convincing evidence,'" *Lutyk*, 332 F.3d at 194, the Court concludes that Habas's allegations do not present a basis for exercising personal jurisdiction over Kulluk.

### 2. Personal Jurisdiction Over Teknoloji Transfer

The Moving Defendants argued in their motion to dismiss that Habas failed to allege a basis for exercising personal jurisdiction over Teknoloji Transfer. They assert that general jurisdiction does not exist because Teknoloji Transfer is a Turkish company that has no presence in and conducts no business in the United States. Additionally, they argue, there is a lack of specific jurisdiction because the Amended Complaint alleges that the contract at issue was entered into between Habas and Intekno (US) by means of the ProForma Invoice. In Habas's brief in opposition to the motion, however, Habas responded that Teknoloji Transfer, which negotiated the contract with Habas and formed the contract prior to the issuance of the ProForma Invoice, was merely the alter ego of Intekno (US).[16]

The Moving Defendants argue that this allegation is unsupported and contradicted by Kulluk's declaration that the two companies were formed at different times for different purposes and that they are operated as separate companies. See also ECF No. 40 Ex. 1 (excerpt from the Intekno Group website, stating that Intekno (US) was formed in Pittsburgh in 1987 and Teknoloji Transfer was formed in Turkey in 1991). *See Mark IV Transportation & Logistics v. Lightning Logistics, Inc.*, 705 F. App'x 103, 107 (3d Cir. 2017) (finding no basis to pierce the

---

[16] The Moving Defendants argue that Habas's position that the contract was formed over an email exchange suffers from three independently fatal defects: 1) the invoice is not consistent with the emails because it changes the seller to Intekno (US); 2) the email chain (which continues through the date of the issuance of the invoice) marks the transaction as international by providing for delivery "CIF" and payment "CAD"; and 3) Habas sent the Letter of Notice to Intekno (US) and identified it as the seller, based on the invoice. At the oral argument, counsel noted an additional problem with Habas's theory: the CISG would not apply to an agreement between two Turkish corporations, nor would Pennsylvania law.

corporate veil when two companies were "formed at different times and for different purposes" such that one could not be considered a "sham or dummy" for the other).

Habas cites Kulluk's positions as Chairman and Chief Executive Officer of the Intekno Group and the sole officer and employee of Intekno (US) and contends that he "leads both companies as a single enterprise and discharges his management functions across corporate boundaries, providing 'strong evidence of an alter ego relationship.'" (ECF No. 37 at 9) (quoting *In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 400 (M.D. Pa. 2009)). In *Chocolate Confectionary*, the court held that certain British companies' vertical management of their subsidiaries, through business units that were aligned with product groups rather than corporate boundaries, coupled with their effective conscription of employees of subsidiaries to discharge group-wide management functions, provided a basis for the exercise of general personal jurisdiction on an alter ego theory. *See also Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018) ("if a subsidiary is merely the agent of a parent corporation, if the parent corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary.") (citations omitted).[17]

However, Habas is not attempting to establish personal jurisdiction over Intekno (US)'s parent. Rather, it is trying to establish personal jurisdiction over Teknoloji Transfer—a "sister company" to Intekno (US)—based on Kulluk's positions with each company. Thus, the

---

[17] In its brief, Habas cites the *Shuker* case for the proposition that, "to the extent the Court cannot determine whether exercising personal jurisdiction over Defendants will conform with the Fourteenth Amendment and Pennsylvania's long-arm statute based on the current record, Habas requests limited jurisdictional discovery." (ECF No. 37 at 19.) While its counsel also cited this standard at the oral argument, when asked if Habas was seeking jurisdictional discovery before a ruling on the motion to dismiss, its counsel confirmed that it was not necessary. The Court concludes that it can resolve the jurisdictional issue on the present record.

*Chocolate Confectionary* and *Shuker* cases are inapposite.

Habas also suggests that defendants may be deemed to have "purposefully availed" themselves of the privilege of acting within Pennsylvania "where the parties enter into a contract which will be performed in Pennsylvania" and that "[t]his is no less true where the contract calls for the plaintiff rather than the defendant to perform in Pennsylvania." *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 (3d Cir. 1984) (Seitz, C.J., dissenting). There are several problems with this argument. First, the quoted language is in a dissent. The majority of the court held that the plaintiff (a Pennsylvania corporation) *failed* to demonstrate that the defendants (a Maryland resort and its owner) had purposefully availed themselves of the privilege of acting within Pennsylvania by entering into a contract for the plaintiff to attract potential customers to purchase vacation interval time shares at the Maryland resort. Second, the contract in this case consists of an agreement to obtain graphite electrodes from outside of Pennsylvania and have them sent to Habas in Turkey.[18] The fact that Habas's payments would be made to Intekno (US)'s bank account in Pittsburgh does not mean that the contract would be "performed" here. *See Time Share*, 735 F.2d at 66 n.7 ("Neither do we believe that the mere issuance of a check which finds its way to a Pennsylvania bank provides the requisite foreseeability of economic impact in Pennsylvania.") Moreover, if—as  Habas now argues—the contract was formed through negotiations between it and Teknoloji Transfer, it is undisputed that those negotiations occurred in Turkey and would not support the exercise of personal jurisdiction over Teknoloji Transfer in Pennsylvania.

Habas also cites *Financial Software Sys., Inc. v. Questrade, Inc.*, 2018 WL 3141329

---

[18] As noted above, no Intekno entity was involved in the manufacture of the graphite electrodes, nor were they manufactured in Pennsylvania. The ProForma Invoice states that the manufacturer was "Graftech Iberica S.L., Pamplona Spain." (Am. Compl. Ex. 1.)

(E.D. Pa. June 27, 2018). In that case, defendant Questrade, a Canadian online trading platform, negotiated with Financial for its services by sending emails and making phone calls into Pennsylvania. Financial agreed to provide software services, such as training, which were to be performed remotely from any of Financial's support locations, including those in Pennsylvania, or at Questrade's Toronto offices. The court concluded that: "Because Questrade assumed long-term obligations to a Pennsylvania-based company and made repeated communications and payments into Pennsylvania, this Court has personal jurisdiction over Questrade." *Id.* at *2. Habas has failed to explain how that case has any bearing on this litigation, which involves the plaintiff, a Turkish company, agreeing to send payment to Intekno (US), a Pennsylvania corporation, for the work performed by that corporation in obtaining components and sending them to the Turkish company in Turkey. Moreover, no payments were ever made.

Habas contends that, if Teknoloji Transfer is Intekno (US)'s agent, then it can be haled into court in Pennsylvania because it did not reveal that it was an agent until after the contract was already agreed upon. "Under Pennsylvania law, an agent who enters into a contract without disclosing that he is acting for a principal is personally liable on the contract." *Leprino Foods Co. v. Gress Poultry, Inc.*, 379 F. Supp. 2d 650, 658 (M.D. Pa. 2005). The Moving Defendants argue that this theory fails both because it depends upon the contract being reached in a series of emails between Habas and Teknoloji Transfer and because Intekno (US) was disclosed: it issued the ProForma Invoice which identified it as the seller and Teknoloji Transfer as its agent in Turkey. As Habas executed the ProForma Invoice and sent a Letter of Notice to Intekno (US), it cannot now contend that Intekno (US) was an "undisclosed principal."

Thus, Habas has failed to assert a basis for exercising personal jurisdiction over Teknoloji Transfer in Pennsylvania. It is a Turkish corporation with no presence in the United States and

there are no facts pleaded which would support the conclusion that it is the alter ego of Intekno (US) or Kulluk or that Intekno (US) was its "undisclosed principal." Therefore, the Moving Defendants' motion to dismiss should be granted based on the lack of personal jurisdiction.[19]

## V.      Conclusion

For the reasons explained above, the motion to dismiss will be granted. An appropriate order follows.


Dated: March 22, 2021                                    BY THE COURT:

                                                         /s/Patricia L. Dodge
                                                         PATRICIA L. DODGE
                                                         United States Magistrate Judge

---

[19] The Moving Defendants also argue that Habas cannot state a claim against them for breach of contract because they were not parties to the ProForma Invoice. The Court need not reach this issue.