**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HABAS SINAI VE TIBBI GAZLAR ISTIHSAL A.S., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 2:19-608 |
| | ) | |
| INTERNATIONAL TECHNOLOGY & KNOWLEDGE COMPANY, INC., | ) | Magistrate Judge Patricia L. Dodge |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Habas Sinai Ve Tibbi Gazlar Istihsal A.S. (Plaintiff or "Habas"), a Turkish corporation, originally brought this action against Defendants International Technology & Knowledge Co., a Pennsylvania corporation ("Intekno"), Intekno Teknoloji Transfer Sanayi Ve Ticaret A.S., a Turkish corporation ("Teknoloji Transfer"), and Halil Kulluk ("Kulluk"), a Turkish citizen who is the sole officer and shareholder of Intekno and a controlling shareholder of Teknoloji Transfer. The sole remaining defendant in the case is Intekno.

Plaintiff's claims arise out of an agreement between the parties for Intekno to sell graphite electrodes to Habas. Habas alleges that, although it accepted Intekno's offer, Intekno breached their agreement by failing to deliver these goods. As a result, it was forced to obtain the goods from an alternate supplier at a higher cost which it seeks to recover in this case.

Pending before the Court is Habas' motion for summary judgment (ECF No. 116). For the reasons that follow, the motion will be denied.

### I.    Relevant Procedural History

Habas commenced this action on May 23, 2019 against Intekno and Teknoloji Transfer and later amended its complaint in which it added Kulluk as a defendant (ECF No. 13). Diversity

of citizenship jurisdiction was asserted, 28 U.S.C. § 1332, because the action was between Habas, a citizen of Turkey, and Intekno, a Pennsylvania citizen. (Am. Compl. ¶ 4.)[1]

On November 24, 2020, Teknoloji Transfer and Kulluk filed a motion to dismiss (ECF No. 25). On March 22, 2021, an opinion and order were filed (ECF Nos. 42, 43) granting the motion on the basis of lack of personal jurisdiction. As a result, Intekno remains as the sole defendant.

After a stay necessitated by discovery issues was lifted, Habas filed a motion for summary judgment (ECF No. 116), which has been fully briefed (ECF Nos. 117, 127, 130).

## II.   Factual Background

Habas is a Turkish corporation that produces industrial and medical gases, steel, electrical energy, and heavy machinery. Intekno is a Pennsylvania corporation that sells materials utilized in the manufacture of steel, including graphite electrodes. Intekno's principal business has been selling graphite electrodes to Turkish steel mills. Its agent is Teknoloji Transfer, a Turkish company. (Plaintiff's Concise Statement of Material Facts ("PCSMF") ¶¶ 1-4) (ECF No. 118).

Habas is a private, closely-held corporation. Mehmet Basaran ("Basaran") holds approximately 73% of its shares and the remainder is held by other members of his family. (Defendant's Responses to Plaintiff's Concise Statement of Material Facts ("DRPCSMF") ¶ 61) (ECF No. 128). While Basaran's approval is required for the purchase of supplies for Habas' steelmaking business (*Id.* ¶ 65), Habas claims that he did not become involved in small transactions such as the one at issue in this case. (Plaintiff's Reply to Defendant's Counterstatement of Material Facts ("PRDCMF") ¶ 65) (ECF No. 132.) Nonetheless, the parties

---

[1] In addition, because this case is governed by the United Nations Convention on the International Sale of Goods, federal question jurisdiction would exist over a "civil action arising under . . . treaties of the United States." *Norfolk S. Ry. Co. v. Power Source Supply, Inc.*, 2008 WL 2884102, at *2 (W.D. Pa. July 25, 2008) (quoting 28 U.S.C. § 1331).

agree that Basaran is the person at Habas who has complete authority to make, approve, amend, modify and terminate contracts on Habas' behalf. (DRPCSMF ¶ 66; PRDCMF ¶ 66.)

Graphite electrodes are an important part of the steelmaking process, as they are used to transfer electricity through electric poles within arc furnaces which creates heat used to melt scrap steel. In a given year, Habas uses between 3,500 and 4,000 tons of graphite electrodes. Habas generally purchases graphite electrodes up to one year in advance to maintain production and keeps a stock of graphite electrodes at a minimum level in storage of about three to four months' supply, or 1,000 to 1,500 metric tons. (PCSMF ¶¶ 5-8, 52.) However, Intekno notes that in January 2018, Habas was maintaining only a three-day supply of graphite electrodes. (DRPCSMF ¶¶ 8, 87-88.)

Because of the complex process to produce graphite electrodes, there are only a handful of quality manufacturers serving the hundreds of steelmakers around the world. Three graphite electrode suppliers, one of which is GrafTech International, Ltd. ("GrafTech"), account for most of the world's manufacturing capacity for graphite electrodes. (DRPCSMF ¶¶ 67-71.) Lower quality electrodes can break in the arc furnace, causing costly disruptions to the steelmaking operations, and are to be avoided. (PCSMF ¶¶ 23-24.)

The steelmaking industry operates in accordance with a number of industry standards and practices that apply to both suppliers and buyers of graphite electrodes. (DRPCSMF ¶ 72.) According to Intekno, buyers and sellers with a longer term relationship tend to use less documentation, while buyers and sellers with a shorter history tend to exchange more documentation of their transactions. (*Id.* ¶ 73.) Habas states that the documentation used by sellers and buyers depends on their administrative procedures, but no more than a proforma

invoice is needed in commercial terms. (PRDCMF ¶ 73.)[2]

According to Intekno, a sales transaction in the steel industry may include conditions of sale and delivery in any agreement that would not necessarily be on the proforma invoice but would be understood or previously agreed between the parties. Experienced buyers in the steel industry would be aware that manufacturers put in reservations to adjust output and price based on conditions. (DRPCSMF ¶¶ 74-75.)

### 1. The Transaction and Related Communications Between the Parties

In December 2016, a telephone call took place between Kivanc Gungor ("Gungor"), an employee of Teknoloji Transfer, Intekno's representative agent in Turkey, and Ayin Aydin Bal ("Bal"), an employee of Habas responsible for purchasing, during which the sale of graphite electrodes were first discussed. (DRPCSMF ¶ 94.) Gungor followed up with an email to Bal on January 2, 2017. The subject line of Gungor's email was "GrafTech – Visit Request." (*Id.* ¶¶ 95-96.) See PCSMF ¶ 9. Gungor explained, in pertinent part as follows[3]:

> As I have informed you on phone in December, we are working with the world renown GrafTech since 2012. We want to use the products of your company with GrafTech.
>
> I would like to visit you at your office this week to personally meet you and discuss the matter in details. Please inform me as soon as possible.

(DRPCSMF ¶ 97.)

Behran Elmaslar ("Elmaslar"), who replaced Bal after he left Habas, responded to

---

[2] Habas states that it previously bought graphite electrodes from Intekno in 2008 and 2009 using a proforma invoice as discussed in this case. (PCSMF ¶ 50.) Intekno denies that Habas bought electrodes from it in 2008 and 2009 (DRPCSMF ¶ 50). This denial must be based on an implied contention that "ITKC Trading," the seller listed on the two proforma invoices (ECF No. 129 Ex. 13) is not the same entity as "Intekno." However, Intekno cites a witness who testified that "they're all the same company" and who noted that the invoice stated that the seller's agent was Teknoloji Transfer, and "it's the same address and the same name." (ECF No. 129 Ex. C, Cakmak Dep. 150:8-9, 14-16.) Thus, there appear to be issues of fact regarding these purchases.
[3] As translated into English by Habas' certified translator.

Gungor's email on February 24, 2017, asking for a trial offer. On March 7, 2017, Gungor responded to Elmaslar with the terms of offers from GrafTech, stressing that "We are always in touch with GrafTech." Elmaslar responded by asking if it was possible to increase the proposed tonnage to 300 tons, 100 tons each for May, June, and July. On March 10, 2017, Gungor responded that "[u]nfortunately they do not have the capacity to provide this tonnage." (*Id.* ¶¶ 98-102.)[4]

On March 21, 2017, Elmaslar sent Gungor a follow-up email in which he sought "information about the subject." Gungor responded that "we are always in contact with our manufacturer GrafTech," but stated that "we could not get a positive response from them yet." Gungor also indicated that in the meantime he would "try to find the best quality electrodes that we can buy via my contacts in China. I will inform you when I get a concrete result." (*Id.* ¶¶ 103-05.)[5]

On April 6, 2017, Elmaslar and Gungor exchanged three emails during which Elmaslar solicited an offer of 300 tons of 600 mm electrodes to be delivered at a rate of 100 tons each month in March, April, and May 2018. On April 7, 2017, Gungor responded to Elmaslar with the terms of "our electrode offer" as follows:

---

[4] The parties agree that there was a written trading agreement between GrafTech and a third company affiliated with Intekno - Intekno Trading Construction Limited in Turkey ("Intekno LTD"), but GrafTech and Intekno LTD had an additional verbal agreement in which it was understood that electrode purchases would be processed through Intekno using its agent, Teknoloji Transfer. (PCSMF ¶¶ 10-11.)

[5] Intekno states that those two sentences on March 21, 2017, are the only mention of Chinese electrodes in the communications between Gungor and Elmaslar; all of their other communications continued to focus solely on the proposed supply of graphite electrodes from GrafTech. (*Id.* ¶ 106.) Habas replies that Gungor's statement only mentions his contacts in China, not Chinese electrode. It disputes that the communications focused solely on the supply of electrodes from GrafTech. (PRDCMF ¶ 106.)

> Electrode: 600x2400mm UHP quality
> Delivery Terms: CIF Izmir/Aliaga port, Turkey
> Delivery Time: 100 MT/month (March, April, May)
> Price: 3.400 Euro/MT
> Payment: CAD
> Manufacturer: GrafTech Spain

(*Id.* ¶¶ 107-08.) After a follow-up telephone call with Elmaslar, Gungor provided Elmaslar on April 19, 2017, with "our revised offer that we have prepared together with GrafTech after our phone call":

> Electrode:
> 600x2400mm UHP
> quality Quantity: 900
> MT (+/-10%)
> Delivery Terms: CIF
> Izmir/Aliaga port,
> Turkey
> Delivery Time: 300 MT, March 2018; 300 MT, April 2018; 300 MT, May 2018
> Price: 3.625 USD/MT for 300 MT to be delivered in March; 3.775 USD/MT
> for 600 MT to be delivered in April and May.
> Payment: CAD
> Manufacturer: GrafTech Spain

(*Id.* ¶ 109; PCSMF ¶ 13.)

On April 20, 2017, Gungor advised Elmaslar that he "had talked again with the sales director of GrafTech. He wanted to inform you about the following to prevent any problem later. 'The offer we have made (yesterday) is valid until the end of working hours on April 28.'" (DRPCSMF ¶ 110; PCSMF ¶ 14.) On April 24, 2017, Elmaslar advised Gungor: "We hereby confirm your order. Congratulations." Gungor responded the next day in pertinent part as follows:

> We appreciate your valuable order.
> Please send me the address, tax ID no and office details of the company to which
> the invoice (proforma & commercial) will be issued. I need them to start the
> necessary registrations with GrafTech.

(DRPCSMF ¶¶ 111-12; PCSMF ¶ 15.)

2. <u>The Proforma Invoice and Related Matters</u>

Gungor's email of April 26, 2017 attached Proforma Invoice No. PF042017107 (the "Proforma Invoice") "based on our previous conversations and confirmations." Elmaslar then returned the Proforma Invoice with Habas' stamp. (DRPCSMF ¶¶ 113-15; PCSMF ¶¶ 16-19.)[6] The Proforma Invoice detailed a delivery of 300 metric tons per month for the months of March 2018, April 2018 and May 2018 at a cost of $3,352,500.00 and identified "GrafTech Iberica S.L., Pamplona Spain" as the manufacturer of the electrodes. Payment was due when the goods were delivered. (PCSMF ¶¶ 20-21.) See ECF No. 121 Ex. H.

Hakki Cakmak ("Cakmak"), the general manager of Habas, read and understood the Proforma Invoice prior to signing it on Habas' behalf. Cakmak reported directly to Basaran and his family members on Habas' Board of Directors, and supervised Elmaslar during the time period when Elmaslar was negotiating the proposed purchase with Gungor. (DRPCSMF ¶¶ 129, 131-35.)

The parties dispute the role of GrafTech. While acknowledging Intekno's statement (DRPCSMF ¶ 116) that GrafTech was identified as the manufacturer of the electrodes to be supplied to it (PRDCMF ¶ 116), Habas asserts that this was not a requirement of the contract. Habas did not care who manufactured the electrodes, as long as they did not come from China. (PCSMF ¶ 22.)[7] Habas claims that it did not know that Intekno required GrafTech to confirm the order or that Intekno's ability to perform under the Proforma Invoice was dependent upon

---

[6] Intekno denies that it signed the Proforma Invoice (DRPCSMF ¶ 59). However, the document (ECF No. 121 Ex. H) has signatures over both companies' stamped names. In fact, Intekno's Appendix contains a version of the Proforma Invoice signed only by Intekno before Habas added its stamp and signature (ECF No. 129 Ex. H Ex. 2 at ITKC_000006).

[7] Habas states that GrafTech being the supplier was not a "material term" of the contract. (PCSMF ¶ 22.) However, as Intekno observes, this is not an issue of fact, but a conclusion of law. (DRPCSMF ¶ 22.)

GrafTech supplying the electrodes to Intekno. It was never informed that GrafTech had not accepted the order. (PCSMF ¶¶ 26-28; PRDCMF ¶¶ 126-28.) Further, Intekno referenced contacting other electrode suppliers and Kulluk testified that Intekno intended to buy the electrodes from GrafTech and sell them to Habas at a profit. (PRDCMF ¶¶ 122-23.)

By contrast, Intekno points to Gungor's April 25, 2017 email stating that he needed information "to start the necessary registrations with GrafTech." (DRPCSMF ¶¶ 26, 112, 126.) It further notes that the sequence of emails between the parties consistently identified GrafTech as the electrode manufacturer and Intekno was always portrayed as the middleman. (*Id.* ¶¶ 119-25.) Intekno contends that, as a result of the email exchanges, it would be impossible for Habas to conclude that the transaction could be completed without GrafTech's approval. (*Id.* ¶¶ 126-28.)

The parties agree that there were no additional terms or conditions for the sale of the graphite electrodes communicated to Habas. (PCSMF ¶ 25.)

Habas did not anticipate that any further documentation would be necessary after the Proforma Invoice was executed, other than to receive a bill of lading and a trade invoice after the delivery was completed. It asserts that it is not uncommon in international commercial arrangements for agreements to have minimal documentation. (PCSMF ¶¶ 29-30.)

According to Intekno, based on the parties' communications and the standards and practices in the steel industry, Habas should have expected further documentation. Habas' expert witness testified that buyers and sellers in this market may use other documents to document their agreement and are more likely to do so if they do not have a prior history of dealings. (DRPCSMF ¶¶ 29-30.)

Intekno claims that based on industry standards and practices, the parties to a transaction documented only with a proforma invoice would still understand that force majeure applied to

relieve them of their obligations. (DRPCSMF ¶¶ 78-80.) Habas responds that suppliers sometimes include force majeure provisions that could be relevant in some circumstances, but force majeure would not apply if, for example, needle coke has become so expensive that a party did not want to supply electrodes at a price they agreed to. (PRDCMF ¶ 80.)

### 3. GrafTech Cancels the Order

In 2017-2018 there was a price hike for graphite electrodes that was unforeseeable and unlike prior price hikes. (DRPCSMF ¶¶ 81-84.) According to Intekno, Habas was aware of the turmoil in the global graphite electrodes market in 2017. (*Id.* ¶¶ 85-86.)

On July 3, 2017, Enrico Mocchetti ("Mocchetti"), GrafTech's Director of Sales, sent an email to Gungor and Kulluk advising that "[a]ll 2018 orders (accepted or still under evaluation) must be cancelled by July 17th."[8] On July 6, 2017, Mocchetti sent a follow-up email in which Graftech cancelled the Habas order and stated that it would make no commitment to provide Habas with any graphite electrodes. From that point on, Kulluk principally dealt with the ramifications of GrafTech's decision. (DRPCSMF ¶¶ 136-40.) Habas agrees that GrafTech canceled the order and notified Intekno. (PCSMF ¶¶ 31-32; PRDCMF ¶¶ 137-38.) However, Intekno did not send any written communication to Habas advising it that GrafTech was cancelling the order. (PCSMF ¶ 33.) Intekno asserts that written notice was not required but that it notified Habas orally multiple times. (DRPCSMF ¶ 33.)

The parties dispute what happened next. According to Intekno, immediately after

---

[8] Intekno claims that as of July 2017, GrafTech had not completed the registration process. The exhibit on which it relies is an email dated November 22, 2018, in which Mocchetti states that, "Unfortunately, the commercial negotiation with Habas was at the point where official [Purchase Order] was not yet validated by supply chain department, nor by sales office issuing an Order Acknowledgement, which is the definitive document that certifies that a commercial agreement has been approved and accepted." (ECF No. 129 Ex. A Ex. 10 at ITKC_000036.)

receiving word from GrafTech, Kulluk called Cakmak and told him that GrafTech had cancelled the Habas order and as a result, Intekno could not supply Habas with the graphite electrodes. Cakmak responded that Kulluk should talk to Basaran and explain the situation to him directly. Kulluk then called Basaran's secretary to arrange a meeting with him. (DRPCSMF ¶¶ 141-43.)

On the other hand, Habas claims that no one called Habas to say the order was cancelled. Rather, Kulluk called Cakmak and asked for a meeting with Basaran without explaining the reason for the meeting, and Cakmak told Kulluk to contact Basaran's secretary, which he did. (PRDCMF ¶¶ 141-43.)[9]

### 4. The July 11, 2017 Meeting

Kulluk claims that consistent with Turkish culture, he chose to deliver the news about GrafTech's refusal to accept the order to Basaran in person out of respect for Basaran. A meeting between representatives of Intekno and Habas took place on July 11, 2017 at Basaran's office. (DRPCSMF ¶¶ 141-44.) In attendance were Basaran, Kulluk, Cakmak, and Kulluk's son. (DRPCSMF ¶¶ 145-47.)

The parties fundamentally disagree about what happened at the meeting. According to Habas, the meeting was purely a social visit. During this visit, Kulluk initiated a side conversation with Cakmak, in which he said that there may be an issue with Intekno's ability to deliver the graphite electrodes on time due to commitments with other customers. However, Kulluk never advised Cakmak or anyone else at Habas that Intekno would not deliver the promised electrodes, or that it was cancelling the order. Later that night, Basaran asked what Cakmak had discussed with Kulluk and why Cakmak had raised his voice with Kulluk. Cakmak

---

[9] Intekno asserts that Cakmak offered several different versions of how the meeting came about. (DRPCSMF ¶¶ 201-07.) As explained below, however, resolving conflicting testimony is a matter for the fact finder.

informed him that Kulluk had said there was a problem with delivering the electrodes. The next morning, Basaran called Kulluk and said he "wanted his materials." (PCSMF ¶¶ 34-35; PRDCMF ¶¶ 149, 152-62.)

According to Intekno, however, Basaran indicated that he already knew that the topic was the failure to complete the graphite electrode purchase from GrafTech, which was confirmed by Cakmak's presence. Beyond "hello" and "goodbye," Cakmak said nothing to Kulluk or anyone else during the meeting. (DRPCSMF ¶¶ 149-50.) After some social interaction, Kulluk advised Basaran that Intekno could not complete the proposed transaction because GrafTech was unable to supply any graphite electrodes to Habas. (*Id.* ¶¶ 152-53.) Basaran stated that he was well aware of the difficulties in the graphite electrode market; indeed, he volunteered to Kulluk that he had recently made a trip to SGL, a German graphite electrode manufacturer, in order to try to secure graphite electrode supplies for Habas' steelmaking operations. When Kulluk informed Basaran about Intekno's inability to supply the graphite electrodes because of the GrafTech situation, Basaran did not suggest that he believed that this was a breach of the parties' agreement or that Habas would hold Intekno responsible for any non-delivery. Based on Basaran's statements, it was Kulluk's understanding that Habas would relieve Intekno of any obligations under the agreement. (*Id.* ¶¶ 154, 156-57.)

Intekno also claims that Basaran asked Kulluk how much more Habas would have to pay GrafTech in order to induce GrafTech to enter into a new agreement to sell graphite electrodes to Habas. Kulluk then responded that GrafTech's inability to supply Habas was not a matter of price but of limited capacity based on conditions in the graphite electrode market. GrafTech's decision was also determined by its analysis of its customer history. Basaran responded that he understood and did not assert that Intekno had an obligation to provide graphite electrodes from

a graphite electrode supplier other than GrafTech. (*Id.* ¶¶ 158-60.) Nor did he state that he believed that Intekno had an independent obligation to provide graphite electrodes to Habas if GrafTech had not accepted the order reflected in the Proforma Invoice. (*Id.* ¶¶ 161-62.)

     5.  <u>Subsequent Events</u>

When the July 11, 2017, meeting was over, Kulluk was confident that Habas agreed that Intekno had no legal obligation to provide it with graphite electrodes. (DRPCSMF ¶¶ 164-67.) Intekno asserts that it had no obligation to cancel the order in writing, nor did it do so because it had already advised Habas orally. (DRPCSMF ¶¶ 36-37.) Habas did not have any further communications with Intekno relating to the transaction described in the Proforma Invoice. In fact, the parties exchanged no emails during the period between April 26, 2017 and January 19, 2018 regarding the purchase of the graphite electrodes. (PCSMF ¶¶ 36-37; PRDCMF ¶¶ 164-67.)

Intekno claims that Habas started looking for substitute goods in July or August of 2017 but was able to find any. (DRPCSMF ¶¶ 164-67.) Habas disputes that Intekno had no legal obligation to provide it with the electrodes. Even though it did not have a clear understanding that Intekno was not going to perform its obligations, it went to the market to look for electrodes out of an abundance of caution. However, there were no companies who were willing to sell any graphite electrodes goods until the beginning of 2018. (PRDCSMF ¶¶ 164-67.)

On January 19, 2018, Elmaslar sent an email to Gungor to "remind" Intekno of its obligation to begin delivery of graphite electrodes in March 2018 and noted that it had planned its steel production based on this shipment. (PCSMF ¶ 38.) Kulluk was surprised to receive this email. (DRPCSMF ¶ 168.) Intekno did not respond by saying that the order had been cancelled (PCSMF ¶ 39) because it claims that Habas had known since July 2017 that the order was cancelled (DRPCSMF ¶ 39). Gungor forwarded Elmaslar's email to Mocchetti at GrafTech with

the comment "they perfectly know what has been discussed afterwards." (DRPCSMF ¶¶ 170-71.) Gungor also advised Mocchetti that he considered that Habas' email "might also [be] a good sign for us since Habas would like to revive this subject and would like to be supplied by us." (*Id.* ¶ 172.)

Once again, the parties dispute what happened next. Habas states that Intekno did not respond to Elmaslar's January 19, 2018 email, instead waiting until March 13, 2018 to request an in-person meeting with Habas and Mocchetti to discuss the transaction. (PCSMF ¶ 40.) However, Intekno claims that almost immediately after receiving Elmaslar's email, Gungor called Elmaslar and spoke to him. Thereafter, Gungor and Intekno employee Erhan Kara met with Elmaslar and Halil Guner ("Guner") at Habas on February 8, 2018. (DRPCSMF ¶¶ 40, 169.) During the meeting, Gungor advised Habas that Intekno could make no commitments to Habas for 2018, although they did discuss the possibility of spot sales. Guner stepped out of the meeting to speak to Basaran and reported when he came back that Basaran was relying on Kulluk to "solve this situation." Gungor replied that Intekno had explained the situation to Habas long before, including when Kulluk explained it to Basaran. (*Id.* ¶¶ 173-76.)

Elmaslar does not recall the phone call, nor does either he or Guner recall a February meeting. (PRDCMF ¶¶ 169, 173.) Habas denies that Gungor's subsequent email to Kulluk acknowledged that Intekno had explained the situation to Habas. Rather, Gungor's email referenced prior events and indicated that Habas was not aware of the seriousness of the situation. Further, the email does not indicate that Habas had excused Intekno from performing under the contract. (PRDCMF ¶¶ 173-76.)

Gungor and Elmaslar then scheduled a meeting at Habas' headquarters on April 12, 2018 with Mocchetti from GrafTech, Guner and Elmaslar from Habas, and Gungor and Kulluk from

Intekno. During the meeting, Guner and Elmaslar spoke to Kulluk in Turkish and Guner spoke to Mocchetti in English. (DRPCSMF ¶¶ 177-79; PCSMF ¶ 41.) By then, the March 2018 date for the first delivery under the Proforma Invoice had already passed and the second delivery was due in April. It is undisputed that Intekno, who denies that any deliveries were due, did not deliver graphite electrodes at any time during the March to May 2018 period set forth in the Proforma Invoice. (PCSMF ¶¶ 42-43; DRPCSMF ¶¶ 42-43.)

According to Intekno, the meeting was an opportunity not just for GrafTech to explain directly to Habas the circumstances that had led to the cancellation the previous July, but also for GrafTech and Intekno to establish a new business relationship with Habas. (DRPCSMF ¶ 182.)[10] No one from Habas asked Kulluk or Gungor about the 2017 contract or claimed that Intekno had breached the parties' agreement. (DRPCSMF ¶¶ 180-81.)

During the meeting, Kulluk asked for the opportunity to talk to Basaran. While the parties dispute the tone of the conversation and precisely what was said, they agree that Basaran said that he wanted the electrodes. (DRPCSMF ¶ 183-84; PRDCMF ¶¶ 183-84.)

6. Habas Purchases Cover Goods

The parties dispute when Habas began looking for an alternative supplier for graphite electrodes as well as when the market disruption and price hikes began. (PCSMF ¶¶ 44-45; DRPCSMF ¶¶ 44-45.) They do agree, however, that the market price of graphite electrodes increased massively between April and August 2017 and the prices remained high through 2018 and into 2019. (PCSMF ¶ 46.)

On June 12, 2018, Habas purchased 1,000 metric tons of graphite electrodes from Tokai

---

[10] Habas contends that during his deposition, Kulluk did not testify about how Intekno may have viewed the meeting, but only about the reason the order was cancelled and the possibility of selling electrodes to Habas. (PRDCMF ¶ 182.)

Erftcarbon, a Japanese manufacturer, at a purchase price of $12,980 per metric ton for a total of $12,980,000. This represented an increased cost of more than $8 million over the price Habas had agreed to pay Intekno. (PCSMF ¶¶ 47-48; DRPCSMF ¶ 76.) According to Habas, if it had not purchased 1,000 metric tons from Tokai Erftcarbon in June 2018, it would have run out of electrodes by November 2018 and would have had to reduce steel production. (PCSMF ¶ 53.)

### 7. Habas Notifies Intekno of Breach

On November 7, 2018, Habas formally placed Intekno on notice of its breach, provided Intekno an opportunity to cure, and notified it that it would claim damages that included the difference between the contract price and the price for the purchase of cover goods on the market. Several days later, Intekno provided Habas' Letter of Notice to GrafTech, stating that Intekno had an agreement to deliver the electrodes to Habas based on the Proforma Invoice that was submitted to Habas "[u]pon our mutual agreement and your written approval," but that GrafTech "elected not to supply the order." (PCSMF ¶¶ 57-58.) Intekno disputes this characterization, noting that it does not state that Intekno had an agreement to deliver electrodes to Habas; rather, it expressed Gungor's "shock" that Habas was taking the position that Intekno had agreed to deliver them. (DRPCSMF ¶ 58.)

Intekno responded to the Letter of Notice and stated multiple times that GrafTech had confirmed the order and agreed on a delivery schedule. (PCSMF ¶ 59.) Intekno's letter denied that it signed any contract with Habas. (DRPCSMF ¶ 59.) Intekno advised that the electrodes would not be delivered at all, stating that "GrafTech officially informed that they would not be supplying the said graphite electrodes as promised by themselves. . ." and that "the current situation was caused due to GrafTech's noncompliance with their initial confirmation of delivery for Habas." (PCSMF ¶ 60.) Intekno notes that Habas had known since July 2017 that the

15

electrodes that were the subject of the Proforma Invoice would not be delivered. Among other things, Intekno's letter explained that GrafTech's decision not to supply electrodes was based on several reasons relating to publicly known developments. (DRPCSMF ¶ 60.)

After Habas' notification of breach, Intekno and GrafTech continued coordinated efforts to sell GrafTech graphite electrodes to Habas. Although GrafTech was offering long-term contracts at $11,500/MT, Habas was not interested. (DRPCSMF ¶¶ 185-86.) Intekno has not pursued any claim against GrafTech. (DRPCSMF ¶¶ 195-96.)[11]

## III.    Standard of Review

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does

---

[11] In the final section of its Concise Statement (DRPCSMF ¶¶ 197-308), Intekno highlights contradictions, so-called feigned amnesia, lack of mental capacity and memory lapses of Habas' witnesses. However, these are credibility issues that must be decided by the fact finder. *See Mest v. Cabot Corp.*, 449 F.3d 502, 514 (3d Cir. 2006).

not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.,* 242 F.3d 437, 446 (3d Cir. 2001).

**IV.    Discussion**

1.    <u>Provisions of CISG</u>

The parties agree that this dispute is governed by the United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. Treaty Doc. No. 98-9 (1983), 19 I.L.M. 671 (1980)(1983), 19 I.L.M. 671 (1980), *reprinted at* 15 U.S.C. App. (1998) ("CISG"). The CISG, which is binding on all signatory nations, creates a private cause of action under federal law. *Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F. Supp. 2d 426, 430 (S.D.N.Y. 2011). "Absent a clear choice of law, 'the Convention governs *all* contracts between parties with places of business in different nations, so long as both nations are signatories to the Convention.'" *Id.* at 431 (quoting *Filanto, S.p.A. v. Chilewich Intern. Corp.*, 789 F. Supp. 1229, 1237 (S.D.N.Y.1992))

"The CISG 'applies to contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States [.]'" *Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 397 (3d Cir. 2010) (quoting CISG Art. 1(1)(a)). The United States ratified the CISG on December 11, 1986. *Id.* Turkey has been a contracting state

since August 1, 2011.[12]

Courts have held that "the Convention's structure confirms what common sense (and the common law) dictate as the universal elements of any such action: formation, performance, breach and damages." *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 924 (N.D. Ill. 1999). *See also Minh Dung Aluminum Co., LTD v. Aluminum Alloys MFG LLC*, 2021 WL 3290686, at *2 (M.D. Pa. Aug. 2, 2021).

However, the CISG differs from state law contract principles in a few important respects. It has no statute of frauds and does not require a contract or a modification of the contract to be in writing or have any other requirement as to its form. *Weihai Textile Grp. Imp. & Exp. Co. v. Level 8 Apparel, LLC*, 2014 WL 1494327, at *6 (S.D.N.Y. Mar. 28, 2014); *AGB Contemp. A.G. v. Artemundi LLC*, 2021 WL 1929356, at *5 (D. Del. May 13, 2021) (quoting CISG Art. 11). Further, because there is no parol evidence rule, the Court may consider statements or conduct of a contracting party regarding the terms or modification of a contract. *Id. See also MCC-Marble Ceramic Ctr., Inc., v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1390 (11th Cir. 1998) (Article 8(3) of the CISG rejects the parol evidence rule). "Under the CISG, testimony of the parties may also contradict the written terms of an agreement." *Alpha Prime Dev. Corp. v. Holland Loader Co., LLC*, 2010 WL 2691774, at *5 (D. Colo. July 6, 2010) (citations omitted).

As stated in the CISG, a contract is formed when there is a valid offer and acceptance. An offer is valid if it is "sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance." CISG Art. 14(1). An offer is "sufficiently definite" if it "indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and price." *Id.; see also Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 531 (9th Cir. 2003)

---

[12] See https://cisg-online.org/cisg-contracting-states/contracting-states-by-name

(noting that "[a] proposal is an offer" which is "sufficiently definite" when it indicates the goods, expressly or implicitly fixes or provides for the determination of quantity and price, and demonstrates intention by offeror to be bound by acceptance). A statement or conduct of an offeree assenting to an offer is acceptance, but silence or inactivity does not reflect acceptance. CISG Art. 18(1).

The CISG also provides that, in determining the intent of the parties, "due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties." CISG Art. 8(3).

2.  <u>Was a Contract Formed?</u>

Habas contends that courts have found that a contract may be formed under the CISG via a series of emails. *See Roser Techs., Inc. v. Carl Schreiber GmbH*, 2013 WL 4852314, at *11 (W.D. Pa. Sept. 10, 2013); *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 252 (7th Cir. 2016). It asserts that an exchange of emails between Habas and Intekno established that it was purchasing specific goods in a specific amounts with specified delivery, price and payment terms.

Further, Intekno indicated that the offer was valid only until April 28, 2017, and on April 24, Habas accepted the offer. Thereafter, Intekno acknowledged Habas' acceptance and requested certain information for the preparation of an invoice. Habas provided the requested information and on April 26, Intekno sent the Proforma Invoice which Habas signed. Habas also notes that the parties had a similar practice by which Habas purchased electrodes from Intekno in 2008 and 2009, thus demonstrating a prior practice consistent with industry standards upon which it relied.

19

Intekno contends that no contract was formed because it was contingent upon GrafTech approving the order and providing the graphite electrodes, but GrafTech did not do so. It points out that GrafTech was copied on every email between Habas and Intekno, and it was clear that the only electrodes that would be delivered were those manufactured by GrafTech.[13]

On the other hand, Habas notes that Intekno never informed it that GrafTech had to confirm the order or that GrafTech had not done so. Rather, Intekno informed Habas that the "offer" was valid until April 28, 2017, and Habas accepted the offer within that time frame by notifying Intekno. In fact, Habas notes, when it sent Intekno a Letter of Notice regarding the non-delivery of the electrodes, Intekno's response indicated that it issued the Proforma Invoice "upon confirmation received from [GrafTech]" and that "GrafTech agreed on delivery time." (ECF No. 119 Ex. Q at 1.) See also ECF No. 121 Ex. H Ex. 8 at ITKC_000032 (November 12, 2018 email in which Intekno told GrafTech, "The non-delivery of electrodes has nothing to with us. Upon our mutual agreement and your written approval, we submitted our proforma invoice to Habas and they approved it.")

The Court concludes that Habas has identified all the elements necessary to establish that a contract was formed for the sale of graphite electrodes. *See Chilean Sea Bass Inc. v. Kendell Seafood Imports, Inc.*, 2024 WL 2324621, at *7-8 (D.R.I. May 22, 2024) (a valid contract was formed between the parties orally and confirmed in writing in a proforma invoice). Although the record supports the conclusion that everyone was aware that the electrodes that were the subject of the contract were to be manufactured by GrafTech, it does not conclusively support Intekno's

---

[13] Intekno also points to the fact that Habas previously took the position in this action that it had entered into a contract with Teknoloji Transfer, but now that it has been dismissed from the case, Habas argues that its contract is with Intekno. However, Intekno cites no authority that would require rejecting Habas' current position based on allegations it made earlier in the case. While this issue certainly can be addressed at trial, it is not dispositive at this point.

contention that GrafTech was first required to approve the order or, even if true, that Habas was made aware of this fact.[14]

      3.  <u>Was GrafTech's Provision of the Electrodes a Condition Precedent?</u>

Intekno argues GrafTech's provision of the graphite electrodes was a condition precedent to its performance of the contract, that, is, the sale of the electrodes to Habas. As such, if GrafTech did not supply the electrodes, Intekno's non-performance is excused. In response, Habas notes that this alleged condition precedent is not included in any of the email exchanges that formed the contract, and therefore, does not excuse Intekno's breach.

As courts have recognized:

> A condition precedent is an event that must occur before a party is required to perform a certain contractual duty. *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 215 N.W.2d 473, 476 (Minn. 1974). "[I]f the event required by the condition does not occur, there [is] no breach of contract." *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 27 (Minn. 2018) (internal citation omitted). However, unless the contract language "unequivocally expresses an intent to establish a condition precedent, [a] court will not construe the contract to have a condition precedent." *Mrozik Constr., Inc. v. Lovering Assocs., Inc.*, 461 N.W.2d 49, 52 (Minn. Ct. App. 1990).

*Brands Int'l Corp. v. Reach Companies, LLC*, 2023 WL 2898592, at *5 (D. Minn. Apr. 11, 2023), *aff'd in part, rev'd in part on other grounds*, 103 F.4th 501 (8th Cir. 2024). In *Brands*, the defendant argued that it had to receive an invoice as a condition precedent to paying the plaintiff, but this argument was rejected as the purchase order contained no such language. *See also Hilaturas Miel, S.L. v. Republic of Iraq,* 573 F. Supp. 2d 781, 800 (S.D.N.Y. 2008) (because confirmation by a third party that the exported goods had arrived and complied with the conditions of a letter of credit was a condition precedent to payment, the failure for this to occur meant that the agreement was not breached.)

---

[14] Moreover, the record supports the conclusion that GrafTech approved the order.

While it logically follows that Intekno could not deliver electrodes to Habas until it received them from a graphite electrode manufacturer, Intekno has not identified any contractual language that unequivocally expresses an agreement that GrafTech's manufacture and supply of graphite electrodes was a condition precedent to Intekno's fulfillment of the contract. What remains disputed is the parties' understanding of the significance, if any, of GrafTech's involvement. Whether the inclusion of GrafTech on emails between Habas and Intekno, and Intekno's representation that GrafTech would be supplying graphite electrodes to Intekno was understood and agreed to by Habas as a condition precedent to Intekno's performance is disputed. Thus, there are material issues of fact about the parties' expectations and understanding about GrafTech's role that will govern whether its manufacture and supply to Intekno was a condition precedent to Intekno's obligation to supply electrodes to Habas.

    4.   <u>Did Intekno Notify Habas of the Cancellation?</u>

Under the CISG, a contract may be terminated by agreement of the parties. (CISG, Art. 29.) There is no requirement that the termination must be in writing.

Habas rejects Intekno's position that it was notified about the cancellation of the contract at the meeting at Basaran's office on July 11, 2017. Rather, Habas contends that no one told its representatives that the contract was cancelled. Moreover, when it notified Intekno in November 20218 of Intekno's breach, Intekno made no reference to this meeting, citing instead the meeting in April 2018.[15] On the other hand, Intekno contends that Kulluk informed Basaran that the contract would not be fulfilled and after he apologized to Basaran for the turn of events, Basaran responded "Yes. Yes. I understand." (Kulluk Dep. 116:4-5) (ECF No. 129 Ex. G.)

---

[15] Habas' letter also stated that Intekno had several meetings to inform Habas about the global developments which were already known to Habas and similar companies in the iron & steel making industry.(ECF No. 119 Ex. Q at 2.)

Focusing only on the witnesses' testimony about what occurred at the meeting on July 11, 2017, the facts are hotly disputed.[16] Viewing the facts in the light most favorable to Intekno as the non-moving party, the fact finder could conclude that, during the meeting, Kulluk informed Basaran that, because of unforeseen circumstances, GrafTech had cancelled all of its orders for graphite electrodes in 2018 and would not be able to produce the electrodes ordered by Habas to be delivered by Intekno. Further, according to Intekno, Basaran indicated that he was aware of the situation, did not suggest that Intekno was breaching the agreement with Habas, and Habas excused Intekno from its contractual duty to deliver the electrodes.

Habas also references events that occurred after the meeting, but they are similarly inconclusive. On the one hand, it argues, Intekno never sent written notice that a multimillion-dollar contract had been cancelled, nor did Intekno respond to Habas' January 19, 2018 email reminder about its responsibility to deliver electrodes in March by stating that the contract had been cancelled the prior July. Further, Gungor claims that he met with Habas in February 2018 to inform them about GrafTech's explanation and "it seems they are still not satisfied with it and very upset about the current situation."[17] Moreover, Habas did not formally begin looking for cover goods until May 2018, after the April meeting. These facts could support an inference that Habas had not excused Intekno from performing the contract.

On the other hand, Intekno asserts that Habas began informally looking for alternative suppliers as early as July 2017. Intekno employees did respond to the January 19, 2018 email by arranging a meeting for February 8, 2018 which the Habas witnesses claim not to remember. Intekno told GrafTech that Habas appeared willing to "revive" the subject of selling them

---

[16] Only Cakmak's testimony can be considered on behalf of Habas because Basaran claims to have no memory of the meeting whatsoever. (DRPCSMF ¶ 249.)

[17] ECF No. 129 Ex. J at ITKC_000031.

electrodes, and Gungor reported to Kulluk after the meeting that Habas employees "are aware of the situation, but do not want to admit it." Further, at the March 2018 meeting, no one from Habas raised the April 2017 Proforma Invoice or suggested that it had been breached. These facts would support an inference that Habas excused Intekno from performance.[18]

In short, there are disputed issues of material fact, including issues surrounding whether Intekno breached its contractual responsibilities or alternatively, Habas excused Intekno from performance of the contract. Therefore, Habas is not entitled to summary judgment on its breach of contract claim.[19]

## V.    Conclusion

For the reasons explained above, the motion for summary judgment will be denied.

An appropriate order follows.


Dated: January 29, 2025                    BY THE COURT:


                                          /s/Patricia L. Dodge
                                          PATRICIA L. DODGE
                                          United States Magistrate Judge

---

[18] Intekno asks the Court to apply the rule that, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, Habas' story is not "blatantly contradicted by the record." Rather, it is contradicted by Intekno's version and is therefore a matter to be resolved by the jury.

[19] Given this outcome, it is not necessary to reach Habas' arguments about damages or interest.